v. All-Tag Security S.A. v. All-Tag Security S.A. Okay, the next case is number 161397, Checkpoint Systems, Inc. v. All-Tag Security S.A. Mr. Palmershan. Good morning, and may it please the court. This is an exceptional case, but not because of anything that Checkpoint did or did not do during the course of the litigation or before it filed suit. It is an exceptional case because the district court awarded $10.2 million as a sanction because of the unreasonable manner in which Checkpoint litigated the case, even though it is undisputed that Checkpoint did not engage in any litigation misconduct. It fully disclosed its infringement theory throughout the case, and it got its case to verdict. And that is why it is so exceptionally important that this court reverse. The court erred. Isn't the point lack of pre-suit investigation? It's not the point, Your Honor. In fact, the lack of pre-suit investigation is not relevant to the reasonableness in which Checkpoint litigated the case. In fact, as this court found the last time we were before you, Checkpoint had ample evidence of the existence of the through-hole, which was the key issue for infringement in the All-Tag Switzerland tags. And even though Checkpoint contended that it had inspected tags from All-Tag Belgium... Did the court find bad faith? This court did not find bad faith last time. No, the trial court. The trial court found bad faith this time. This court did not find bad faith last time. Don't we owe deference to that finding? Pardon? Don't we owe deference to that finding? Abusive discretion? You do owe deference, but when this court determines that the record indicates that a mistake has been made, this court needs to reverse. And deference is not without limits. Abusive discretion is not without limits. Abusive discretion has to be guided by sound principles. It can't be the subject of whim or some sort of free-wheeling decision. And if you look at the decision in this case, it is fraught with inconsistencies in the court's earlier rulings, in the case that it presided over. The fact is, if you go back and read the district court's contemporaneous rulings throughout the case, any reasonable observer would conclude that Checkpoint could have brought the exact same case again regardless of its motive. And this demonstrates the inherent flaw in the district court's conclusion that motive made this case exceptional, extraordinary or outside the norm. The district court green-lighted this case every step of the way. Checkpoint disclosed its litigation theory. It disclosed its evidence. And it did this at claim construction, which the court ruled in its favor. It did it at summary judgment, ruled in its favor. It did it on the Dahlberg hearing. And it did it after two Rule 50 motions for direct to verdict. The case ended up going to the jury. Defendants have never pointed out anything that Checkpoint did during the litigation that ran up the fees, that was anything outside the norm of what one would expect in typical patent litigation. There were no discovery abuses, no claims of unprofessionalism, or no claims of vexatious or harassing conduct during the litigation. The district court focused on Checkpoint's supposed knowledge before it followed suit that the patent was somehow inoperable. And what the district court focused on there, in its conclusion, was clearly an error of law and an error of fact. The district court never implied the impossibility standard to determine whether or not the claims were inoperable. The district court simply looked at testimony from one of the witnesses who had said that Actron had tried to make the invention disclosed in the patent and was unable to manufacture it. But this was contrary to evidence in the record that demonstrate, for instance, that this label that was manufactured pursuant to the patent was actually being sold. It was found to have been in the ITC. It was determined that they were, in fact, making a label with a through-hole. And Checkpoint's reasonable belief infringement further demonstrated that Checkpoint had a belief that the patent, in fact, worked. The indisputable conclusion that Checkpoint's motive, whether good or bad, could not change the fact that the defendants were accused infringers with a claim that was strong enough to get to the jury. In fact, a claim on which they tried to concede infringement before trial as to one of the accused labels.  to prevent gross injustice associated with an accused infringer having to pay attorney's fees that it should not have been forced to incur. This court has recognized post-octet that a fee award must bear some relation to the extent of the misconduct. But by failing to establish a nexus between the fee award and Checkpoint's motive, the district court handed these defendants a windfall untethered to the purpose underlined in Section 285. Judge Lurie, you talked earlier about pre-suit investigation. First, there was no reason for the district court to go back and question Checkpoint's pre-suit investigation. Courts that have looked at pre-suit investigation have done so after they have found the case to be frivolous. And they have gone back to determine if the plaintiff knew or should have known of the problems associated with its claim and could have done so through a more basic pre-suit investigation. Here, however, Checkpoint's pre-suit investigation was not relevant to whether the claim was exceptional because the court repeatedly ruled throughout the case that Checkpoint had sufficient evidence of infringement. Moreover, the district court's conclusions regarding Checkpoint's pre-suit investigation proved nothing about what Checkpoint knew about the merits of the case. If you look at the district court's decision, the district court questioned pre-suit investigation because Checkpoint supposedly received only two oral opinions regarding infringement. And it questioned those oral opinions because it said it wasn't clear what products those opinions were on, which companies, and which law they came under. And what the court was referring to was the litigation that Checkpoint had against Alltag in Switzerland in which it had a finding that the product did infringe. And it was also referring to this distinction that the defendants continued to try and make or did not try to make during the entire case, that between Alltag Switzerland and Alltag Belgium. The fact of the matter is Checkpoint was thoroughly familiar with the structure and operation of the Alltag tags. You see that throughout the record in this case. Checkpoint litigated against Alltag in Switzerland and had a finding of infringement. Checkpoint litigated against Alltag before the ITC. The ITC made a finding about the structure of the Alltag tags, found that those tags had a hole in the dielectric layer, which was the key inquiry for purposes of infringement. The irony of the pre-suit investigation is... What was the result of the ITC proceeding? They found for Alltag, but it was under a different patent. And the point of the ITC proceeding, though, is in that ITC proceeding, as defendants, owns, executives admitted, Checkpoint became thoroughly familiar with the operation and the structure of the Alltag tags. And again, the issue was whether or not there was a through-hole. Checkpoint, after it acquired the 555 patent, then sued Alltag in the United States after it started to see its products come onto the market here. So when the district court faulted Checkpoint for its pre-suit investigation, it overlooked the fact that Alltag, throughout the entire case, made no distinction between Alltag Switzerland and Alltag Belgium. They, in fact, tried to claim that they are one and the same for purposes of infringement. And if you look even further at the record, the district court's factual conclusions with respect to pre-suit investigation and what a more robust pre-suit investigation would find are fatally flawed. And the district court has this formalistic analysis of pre-suit investigation, a false checkpoint for having oral infringement opinions and no written opinions as to infringement. But nothing in the district court's opinion ever explains what it was that a more robust pre-suit investigation would have found. More importantly, the district court's opinion never explains how a more robust pre-suit investigation would have had any impact on how the case was litigated. The court never explains that. There is no nexus between the supposedly inadequate pre-suit investigation and the reasonableness of how Checkpoint litigated this case. And there's certainly no basis to find that inadequate pre-suit investigation somehow justifies $10.2 million in fees. The district court also erred in finding that it was unreasonable for Checkpoint to assess infringement based on an argument that Alltag manufactured its tags according to two method patents, 343 and the 466. The important thing about this is the court's decision that made this case exceptional focused on the very same issues that the district court ruled on during the case. The district court ruled on this very theory of infringement and found several times that the evidence of infringement was sufficient to continue and go all the way to the jury. And I think that's particularly important here because in determining the reasonableness of how Checkpoint litigated this case, the court has to look into those circumstances. And the court has to look into the contemporaneous rulings in the case and how that guides the case along. This court has recognized a similar principle in the Medtronic v. Brain Labs case. This court recognized that a patentee should be able to rely on a district court's rulings as an indication that the claims are reasonable. And while that went to the strength of the case, the same principle applies here. The parties should be able to rely on the district court's rulings indicating that the case is on track, that it's being litigated in a reasonable way. But that's not what happened here. The district court's ruling that Checkpoint unreasonably assessed infringement is an about-face from the position that it took at trial and its statement that Checkpoint could prove infringement in reliance on the 343 and the 466 patents together with the defendant's pretrial admissions that it manufactured the products according to those two patents. As this court recognized the last time we were before you, the issue is fairly simple. Checkpoint served requests for admissions on defendants saying admit that your product has a through-haul. Defendants answered those, stating that they manufactured their labels according to the 343 and the 466, generally according to 343 and 466. The purpose of both of those method patents, though, was to create a label that had a through-haul. Checkpoint fully disclosed to the district court how it intended to prove infringement. In fact, during the Daubert hearing argument on whether or not defendants could exclude Checkpoint's expert, Dr. Zahn, because he supposedly had not inspected the correct labels and he was relying on a patent, the court asked Checkpoint about its theory of infringement. The court said to the counsel, Mr. Supplee, is your position that Dr. Zahn did not have to review the product that was produced by the 343 patent in order to give an opinion about the fact that the patent infringed? Mr. Supplee said, that's exactly correct, Your Honor. Eight years later... Because he had tested the samples? Because... And why was that viewed as correct? Two things. Because, first of all, Checkpoint believed that it had direct evidence infringement because it inspected a label. It believed that it was an all-tag Belgium label. Defendants would later claim that it was not an all-tag Belgium label, it was all-tag Switzerland. This court recognized, though, that the last time around, that the defendants never demonstrated that there was any difference between the two. They never demonstrated that all-tag made labels with a hole in Switzerland but without a hole in Belgium. And remember, all-tag picked up the company, moved it from Switzerland across the border to Belgium, and started making the exact same labels with the exact same equipment. But more importantly, though, Checkpoint disclosed to the district court that it could use those admissions as to how they manufactured their labels as evidence of infringement because both of those methods called for a label with a through-hole. Only difference between the two was how the through-hole was made. And that was the whole issue of infringement at trial. And the district court green-lighted that theory of infringement. The district court allowed the case to go forward, did not disqualify Dr. Zahn from testifying, implicitly finding that he had a reasonable methodology and his opinions were reliable. But it also went further. It heard all of the testimony about the supposed differences between the manufacturing process and the labels. These are the same things the district court would come back to an exceptional case finding saying that the infringement assessment was unreasonable. Heard all of that testimony. And defendants moved for a directed verdict and a judgment as a matter of law. The court denied both of those, stating, and this is important, the evidence of infringement is sufficient to continue. And the court sent the case to the jury. Okay, we're running short. Let's hear from the other side, and we'll save you rebuttal time. Good morning, Your Honors. May it please the Court. I'm Kelly Tillery for the apologies. Standard review here is simple. It's abuse of discretion, a very tough standard, particularly where the United States Supreme Court has said that this court should give great deference to the decision and exercise of discretion by the trial court, who heard this case and had it for almost 15 years. But if there's an error of law, that's a different story. The court said it found that the evidence demonstrates that Check Point's motive was not to assert its patent rights but to interfere improperly with defendants' business and to protect its own competitive advantage. Well, if you have a valid patent, isn't it quite reasonable on the whole point to protect your competitive advantage by asserting a patent? First of all, it didn't have a valid patent. The jury found it invalid, and five different human beings told Check Point before they filed the suit that the patent was inoperative and therefore invalid. Check Point didn't listen to them.  That finding is not a finding of law, Your Honor. That's a finding of fact. The finding that someone did something for a particular bad reason is a finding of fact, not a finding of law, and therefore the test is abuse of discretion. But if we were to... I don't think that Judge Lurie was disputing with you that the test is abuse of discretion, but under the abuse of discretion standard, we review questions of law de novo. But isn't it a question of law if, for example, we disagree and say that their lawsuit, while they lost, was nonetheless objectively reasonable? Isn't it a question of law as to whether or not it would be okay, in light of an objectively reasonable suit, for the district court to base an exceptional case finding exclusively on motive? I don't think it's an error of law. I don't think it's an issue of law, Your Honor. I think the Supreme Court has said that motivation is a separate and distinct element. In Octane Fitness, Judge Sotomayor specifically said that you can have substantive strength... That would suggest that every time someone loses, even if they had an objectively reasonable case, and it was very close, and many of these patent cases we get are very, very difficult to decide and very close, then that would suggest that any time there's an email that says, I really want to stop them from making this, I want to drive them out of business so I don't have to compete with them. Well, that's something actually, quite frankly, a patentee should be allowed to do because they have a right to exclude and exclude their competitor if the competitor is stealing their technology. I feel as though the rule of law you're asking for is a rule that if there is evidence of motive that isn't just wanting to enforce a patent, but wanting to make that company stop competing with you, that that shows bad faith and that that standing alone is enough if you lose. But that's not what I'm asking for, Your Honor, what I'm asking for. This case is actually sui generis. I don't think we'll ever see a case like this again because we have much more than just an email or testimony about bad intent. We have evidence that these people knew that this patent was inoperative and invalid. They used it as a nuisance patent. They used it as a club over the head of a competitor. The district court didn't make any findings to that extent. Sorry? The district court didn't make any findings to that extent. The district court specifically said they had improper motive of crippling defendant's business not to assert their patent rights. But the district court didn't say they knew they had an inoperative patent. Oh, yes, it did, actually, Your Honor. Where does it say that? The Geiges footnote. She took as credible the testimony of Lucas Geiges, who was the president of Actron. Are you talking about footnote one? Yes, Your Honor. Appendix 19. Yes, Your Honor. In the opinion footnote one, on the matter of whether Checkpoint knew the 55 patent to be inoperative, however, the court finds Mr. Geiges' testimony credible. In addition, the record includes the testimony of at least four other witnesses who also testified that Checkpoint knew that. And, of course, the finding of the jury was that it is inoperative. He finds this person's testimony credible, but what he doesn't say is, well, he doesn't say Checkpoint knew it was asserting an inoperative patent. What she's finding is the testimony. The testimony was he told them that it was inoperative. He told them, don't pay the renewal fees. And they chose to use it as a nuisance patent. Indeed, four other people told them that. Mr. Jorgensen, Mr. Pickle, Mr. Bleak, Mr. Bowles, and Actron, the prior owner of the patent, didn't attempt to enforce it because they knew it was inoperative. So this is a very unique circumstance. This is not just finding one bad email that somebody mouthed off about going after a competitor. This is where they actually knew the patent was bodice, and they proceeded anyway in order to make the other competitor go out of business. And you know, that's exactly what happened. They put them out of business. So the irony is... There was no finding that the patent was bogus? I'm sorry? There was no finding that the patent was bogus? The jury found that way, yes. The jury did. And the district court supported that. Not as a matter of a specific interrogator. The jury found it was invalid. They found it inoperative. There's a specific interrogator. There are 15. There's a specific one finding it inoperative. It was found invalid for four different reasons. One of them was inoperative. And the district court, seeing the testimony, agreed. So there is, in fact, a finding. And Check Point did not appeal that finding. They're stuck with it. So again, Your Honor, the question is, it's not just finding one bad email or one bad comment. This is a different case than that. This is very similar to actually Octane Fitness when it went back down on remand. Because we have more evidence of that. We have the findings of the court, not only for bad motive. They specifically found that the Check Point knew it. That's a specific finding of the court. They knew it to be inoperative. They also failed to conduct an accurate pretrial investigation. And they failed to examine the actual product. For each of those facts found, Your Honors, there is ample supporting evidence of record. There's no way one can be left with a definite, firm conviction that a mistake has been made. The district court's account of the evidence is more than plausible. And there's certainly no basis to say that the district court took leave of her senses. The jury verdict is consistent. The Check Point did not appeal. I want to bring to the attention of the court, Your Honor, a case of the Supreme Court three days after the last brief was filed. Three days after it was filed in the Supreme Court in Kurt Sanger versus John Wiley, held in a copyright fee case, that a district court retains discretion to make an award even when the losing party advanced a reasonable claim or defense. That was a unanimous decision by Justice Kagan. The Supreme Court, although a copyright case, of course, the same standard discretion applies, said that a district court may award fees even though the losing party offered reasonable arguments. And in that case, that would apply here, because Check Point says, well, we got to the jury. Therefore, we must have had a case that was litigated reasonably. So you think the way the Supreme Court's decisions should now be interpreted is that generally the loser will pay the attorney's fees? Oh, no, not at all, Your Honor. It's still a standard. It still has to be met. There's no question. Octane Fitness, you have to either prove lack of substantive strength or unreasonable manner of litigation. And then the Fogarty versus Fantasy factors. Those were all applied to the totality of the circumstances to a case that a jurist with 28 years of experience on the bench seeing cases applied here to the totality of circumstances. It's certainly not a guarantee. As a matter of fact, again, I can't imagine there will ever be another case where we have such incredible evidence of unreasonable manner of litigation. And as to Mr. Palmerschein's point, it does not have to be. Not unreasonable manner, but unreasonable motive. It was the motive that seemed to make an impression on the district court. It's certainly one of the six reasons. The court certainly quoted the executive's statements. Yes. We'll make them believe legal fees Austin, we call him. He's the one who initiated the litigation for that reason. But there are four reasons. Actually, there are six reasons that are given, not just one. That was only one of the reasons. It should be ample. Frankly, the Supreme Court says it's ample and sufficient. But again, we have unique circumstances here. We have unique evidence. I think this case is sui generis. Thank you, Your Honor. Any more questions? Any more questions? Thank you. Thank you. Mr. Palmerschein, you have your rebuttal time. I'd like to come back to this. Mr. Palmerschein, I'd like you to start with footnote one. I read footnote one as the district court saying he found Mr. Giygas's testimony to be credible. But Mr. Giygas just says that he told Checkpoint he thought it was inoperative. That doesn't mean that Checkpoint knew it was inoperative, nor does that convert this into a fact finding that the district court found Checkpoint was asserting a patent it knew to be inoperative. Is that your understanding of this factual record? It is, Your Honor. I don't think Mr. Giygas ever said that I told Checkpoint it was inoperative. And we point that out in a brief. We actually look at the actual testimony in which he said that Actron had tried but failed to manufacture a label according to it. It doesn't mean, though, that the claims limitations were impossible. Yes, but even if this were the fact finding that the opposing counsel said, even if this were what the opposing counsel says it is, even if Mr. Giygas had said he thought the patent was inoperative, that doesn't mean that they're knowingly, that doesn't convert this into a fact finding that Checkpoint is knowingly asserting an inoperative patent, does it? I agree, Your Honor. It does not. If you look at the inoperability issue, the district court didn't even focus on that until eight years after the jury returned its verdict. And the only mention of it, I think, in the entire opinion, is in that footnote one. I agree, Your Honor. So clearly that was not some cornerstone of his determination as to why this case is exceptional. I agree, Your Honor. And if you look at the first time we were before you on an exceptional case, inoperability didn't even make it into the district court's opinion. And didn't they argue in their laches motion that the tags from Belgium and the tags from Switzerland were identical? Didn't they actually make that argument? They made that argument, Your Honor. In their laches motion to the district court? That's correct, Your Honor. And so would that have supported the reasonableness  and thinking it would be the same as the tag from Belgium in advance of the litigation? That's what we contended, Your Honor. That's consistent with what the federal circuit found the last time around. In fact, as the federal circuit found the last time around, defendants never argued that their labels did not contain a through-hole. And no witness throughout the case ever so testified. And there was testimony that the method would be used if it did contain a through-hole, that this structure would necessarily implicate use of the method claims. Which is consistent with what the federal circuit found the last time as well, Your Honor. So tell me precisely what is your evidence of what you did in advance of litigation? Because unlike defendant Rappelli's arguments about inoperability, which I really did not see being a cornerstone of this district court's opinion, I really did think what I was reviewing in terms of her opinion is a determination that you hadn't performed a reasonable investigation in advance. So please tell me exactly what you had done in advance of bringing this litigation. Checkpoint litigated against Alltag Switzerland in the ITC where there was a finding by the ITC that the Alltag Switzerland label, which the testimony demonstrated, never changed between Alltag Switzerland and Alltag Belgium. Didn't even change up until just, if it did, just prior to the litigation. Litigated against them there, the ITC made a finding that there was a through-hole. In other words, a hole in the dielectric layer. Checkpoint also got oral opinions from Swiss counsel, who was litigating against Alltag in Switzerland on the foreign counterpart to the 5-5 patent, which was called the hole in the dielectric layer patent, where Checkpoint did get a judgment infringement. And also got another opinion from a US lawyer that the Alltag Do you have any opinions, though, related to this patent? To the US opinion was related to the 5-5-5 patent. There's really no distinction between the Swiss patent and the 5-5-5 patent because it rose out of the application. Yes, but one of their arguments is, I think, if I remember right, that that patent, the opinion was given based on Swiss law, not US infringement law, perhaps, right? Is that one of their arguments? The claim was the same. The limitation was, more or less, a hole in the dielectric layer. And the key inquiry was on what turned out to be, we argued, the same product. Were they both device claims or both method claims? Sometimes there's a difference. My recollection is they were device claims, Your Honor. And they were both device claims, Switzerland and the United States? Correct, Your Honor. One other point with the limited time that I have here. I wanted to come back to this whole notion of all this evidence of Checkpoint's bad faith. As Your Honor pointed out, what if there is just a single email, and that is found in the company's files, and is that then going to give rise? That's essentially what happened here. The court's finding that there was some sort of improper motive was based on a single conversation that occurred between two people. And it was denied on one side. And there are no contemporaneous notes or documents that back up what supposedly was said. Moreover, if you look at the district court's finding with respect to Checkpoint's modus operandi, as my friend refers to it, if you really look at the record, Checkpoint really did not have a history of suing and acquiring competitors. Checkpoint had three lawsuits before this one. It had the one in Switzerland against Alltag, which it won. It had a lawsuit against a company called Tokai, which it won. And then it had another lawsuit involving Actron, and it ended up acquiring Actron. The district court and my opponent focus on what may have happened afterwards. There were two acquisitions afterwards, but there's nothing in the record that supports the court's conclusion that any of this demonstrated that Checkpoint was a bully or it had some sort of anti-competitive conduct when it brought this case. One final point, going back to motive. This court in the past, in Forrest Labs and other cases, has said that it will not bring into the exceptionality question whether or not pre-suit bad faith can give rise to an exceptionality claim. And I think the court should adhere to that. We've been before you three times now in this case. We were before you back in the early 2000s on inventorship. You reversed the district court then. We were back before you almost four years ago to this day arguing the first exceptional case motion, and you reversed that. We ask that you a third time reverse the district court. Thank you. Okay, thank you. Thank you both. The case is taken under submission.